## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

```
_____
                              :
D.O. and M.O., on behalf of   :
C.O., a minor child, M.W. and :
G.W., on behalf of C.W., a    :
minor child, and J.G.         :
individually,                 :
                              :   Civil Action No.
            Plaintiffs,       :   10-cv-2339 (NLH)(AMD)
                              :
      v.                      :   OPINION
                              :
EDWARD F. BORDEN, JR.,        :
HADDONFIELD POLICE DEPARTMENT,:
and BOROUGH OF HADDONFIELD,   :
                              :
            Defendants.       :
_____   :
```

**APPEARANCES**:

Hercules Pappas, Esquire
and
Matthew S. Wolf, Esquire
Pappas & Wolf, L.L.C.
423 White Horse Pike
Haddon Heights, NJ 08035
*Attorneys for Plaintiffs D.O. and M.O., M.W. and G.W., and J.G.*

John Charles Gillespie, Esquire
Parker McCay, P.A.
Three Greentree Center
7001 Lincoln Drive West
P.O. Box 974
Marlton, N.J. 08053
      and
Mario A. Iavicoli, Esquire
43 Kings Highway West
Haddonfield, N.J. 08033
*Attorneys for Defendants Edward F. Borden, Jr., Haddonfield Police Department, and Borough of Haddonfield*

**HILLMAN, District Judge**

      Plaintiffs, D.O and M.O., on behalf of their minor child

C.O., M.W. and G.W., on behalf of their minor child, C.W., and J.G., individually,[1] filed a putative class action suit in this Court against Defendants, Edward J. Borden, Jr., a Commissioner and the Public Safety Director of the Borough of Haddonfield, the Haddonfield Police Department, and the Borough of Haddonfield. According to Plaintiffs, Defendants have violated Attorney General Law Enforcement Directive 2008-2, and its predecessor, Law Enforcement Directive 2005-4 (individually or collectively, "the AG's Directive").  The AG's Directive promulgates "Guidelines for Stationhouse Adjustment of Juvenile Delinquency Offenses."  Plaintiffs allege that, in disregarding the Directive, Defendants have infringed upon their constitutional rights.  Presently before the Court are Defendants' motions to dismiss Plaintiffs' amended complaint and to dismiss Plaintiffs' injunctive, declaratory, and equity claims.

For the reasons expressed below, Defendants' motions are granted in part and denied in part.

## I.    JURISDICTION

Plaintiffs have set forth federal constitutional claims pursuant to 42 U.S.C. § 1983, as well as state constitutional claims under the Constitution of the State of New Jersey.  This

---

[1] Because this case involves minors and their parents, abbreviations are adopted to protect the identities of the minors and the privacies generally accorded to minors in legal proceedings.

Court has jurisdiction over Plaintiffs' federal claims under 28
U.S.C. § 1331, and may exercise supplemental jurisdiction over
their state law claims under 28 U.S.C. § 1367.

## II.   __BACKGROUND__[2]

In December 2005, Peter C. Harvey, then the Attorney General
of the State of New Jersey, issued Attorney General Law
Enforcement Directive 2005-4, promulgating "Guidelines for
Stationhouse Adjustment of Juvenile Offenses."  The intent of the
AG's Directive was to provide law enforcement agencies with an
alternative method to punish and discipline first-time juvenile
offenders, while averting the more severe consequences and
ramifications of the juvenile justice system.[3]  Pursuant to the

---

[2] In ruling on a motion to dismiss pursuant to Federal Rule
of Civil Procedure 12(b)(6), a court has "discretion to address
evidence outside the complaint . . . ."  CitiSteel USA, Inc. v.
GE, 78 F. App'x 832, 835 (3d Cir. 2003) (citation and internal
quotation marks omitted).  As such, "a court may examine the
facts as alleged in the pleadings as well as matters of public
record, orders, exhibits attached to the complaint, and items
appearing in the record of the case."  Tilbury v. Aames Home
Loan, 199 F. App'x 122, 125 (3d Cir. 2006) (citation and internal
quotation marks omitted).  In addition, the court "may consider
an undisputedly authentic document that a defendant attaches as
an exhibit to a motion to dismiss if the plaintiff's claims are
based on the document."  CitiSteel USA, 78 F. App'x at 835
(citation and internal quotation marks omitted).

[3] The stationhouse adjustment program was originally
established in 1990 by Attorney General Executive Directive 1990-
1.  In its section entitled "Curbside Warnings and Stationhouse
Adjustments," Directive 1990-1 reads, in part:

> There are numerous occasions, however, where
> less serious matters can be satisfactorily
> resolved or "adjusted," either at curbside or

3

AG's Directive, a juvenile officer would conduct a stationhouse adjustment wherein the juvenile, his or her parent or caregiver, and the victim meet with the officer to discuss the juvenile's minor offense.  The parties then attempt to resolve the matter, which may include restitution, a referral of the juvenile for services, and assurances that the juvenile will not commit any future offenses.  Moreover, as part of the AG's Directive, a section, entitled "Mandatory Availability of Stationhouse Adjustments," reads, in relevant part:

> All municipal and other law enforcement agencies having patrol jurisdiction within the State of New Jersey shall make stationhouse adjustments available as a method of handling minor juvenile delinquency offenses within their jurisdiction.

(Pl. Amend. Compl. at 6).

In or around late March 2008, the New Jersey Attorney General, Anne Milgram, promulgated Attorney General Law Enforcement Directive 2008-2, which revised and replaced

---

> at the police stationhouse, without the need for a formal adjudication of delinquency, the filing of a complaint or even the taking of a juvenile into custody.  It shall therefore be the policy of this State to encourage the use of "curbside warnings" or "stationhouse adjustments" as an appropriate law enforcement response to non-serious juvenile activity that does not warrant either the taking of a juvenile into custody or the filing of a complaint alleging delinquency.

(Pl. Opp., Wolf Decl., Exh. A, § 8).

Directive 2005-4.  In all relevant respects, the Directives are
said by the parties to be similar.  In a section entitled
"Offenses to be Considered for Stationhouse Adjustment," the AG's
Directive provides: "Ordinance violations, petty disorderly
persons offenses and disorderly persons offenses shall be
considered for stationhouse adjustment.  Fourth-degree offenses
may also be considered for stationhouse adjustment if the
juvenile has no prior record that is known to the law enforcement
agency." (Directive 2008-2, at 4).  The AG's Directive specifies
certain offenses excluded from the diversionary policy, but adds,
in a subsection entitled "Other Factors to be Considered," that
"Police shall also consider the following factors when
determining the appropriateness of conducting a stationhouse
adjustment[.]" (Id. at 5).  Among the salient factors are the
juvenile offender's age and prior record and the cooperation and
attitude of all parties, including the juvenile and his or her
parent or caregiver.

On or around October 2, 2007, the Borough of Haddonfield
("Borough") and the Haddonfield Police Department, at the behest
of Edward F. Borden, Jr., a Commissioner and the Public Safety
Director of the Borough of Haddonfield, issued an official policy
memorandum marked as 07-007 ("Policy Memorandum").  The Policy
Memorandum provided, in part: "All patrol personnel will process
juveniles violating any alcohol or narcotics offense on a formal

petition.  These offenses will not be given a Station House
Adjustment." (Pl. Amend. Compl. at 6).  In accordance with the
Policy Memorandum, "Borden directed officers under 'strict
instructions' to ignore the Attorney General's directive, to not
provide stationhouse adjustments and to charge all juveniles
involved in alcohol-related offenses." (Id. at 7).  In
furtherance of the Borough's policy against underage alcohol
consumption or drug use, Borden handled confidential juvenile
records, including police reports, sharing them between the
Haddonfield Police Department and the Haddonfield School
District.

In 2008, J.G., a minor at the time,[4] was charged with a
minor alcohol-related offense.  Similarly, in 2009, C.O. and
C.W., both minors, were charged with minor alcohol-related
offenses.  Because of the Borough's policy, however, all three
individuals were denied a stationhouse adjustment in lieu of
their formal charges.

In May 2010, D.O. and M.O., individually and on behalf of
their child, C.O., brought a putative class action suit against
Defendants in this Court.  About a month later, the complaint was
amended to add as plaintiffs M.W. and G.W., on behalf of their
minor child, C.W., and J.G., individually.  According to

---

[4] J.G. is now a legal adult, over the age of eighteen years.
However, at the time of her charge in 2008, she was a minor.

Plaintiffs, Defendants' disregard of and refusal to effectuate the AG's Directive violates Plaintiffs' constitutional rights to due process and equal protection guaranteed by the Fourteenth Amendment to the United States Constitution and the New Jersey Constitution, and the right to be free of unreasonable seizures guaranteed by the Fourth Amendment to the United States Constitution.  Thus, Plaintiffs advance federal civil rights claims pursuant to 42 U.S.C. § 1983, along with corollary New Jersey state constitutional claims.  In relief, Plaintiffs seek compensatory and punitive damages, attorneys' fees and costs, and declaratory, injunctive, and equitable remedies.

In July 2010, Defendants moved to dismiss Plaintiffs' amended complaint and their injunctive, declaratory, and equity claims.[5]  Soon thereafter, Plaintiffs voluntarily dismissed the Haddonfield Police Department as a defendant, acknowledging that for purposes of Section 1983 the Police Department is inseparable from the Borough, which already is named as a defendant in the

---

[5] Defendants move to dismiss Plaintiffs' claims for failure to state a claim upon which relief may be granted.  In a separate motion, Defendants move to dismiss Plaintiffs' injunctive, declaratory, and equity claims.  Defendants' two motions rely on the same bases of law and fact, but were filed individually due to the fact that Defendants' insurer, who covers and defends against any claims for damages, does not handle any injunctive, declaratory, or equity claims brought against Defendants.  With respect to the latter claims, Defendants are represented by the Borough's Solicitor.  Nevertheless, given that both motions rely on the same arguments and necessitate the same analysis, the Court addresses the motions jointly and need not distinguish between them.

case.

## III.  DISCUSSION

### A.    Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6), a court must accept all well-pleaded allegations in the complaint as true and view them in the light most favorable to the plaintiff.  Evancho v. Fisher, 423 F.3d 347, 350 (3d Cir. 2005).  It is well settled that a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).

A district court, in weighing a motion to dismiss, asks "'not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim.'" Bell Atl. Corp. v. Twombly, 550 U.S. 544, 563 n.8 (2007) (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Ashcroft v. Iqbal, 129 S. Ct. 1937, 1953 (2009) ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)).  Under the Twombly/Iqbal standard, the Third Circuit has instructed a two-part analysis.  First, a claim's factual and legal elements should be separated; a "district court must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions."  Fowler v. UPMC

8

Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009) (citing Iqbal, 129 S. Ct. at 1950).

Second, a district court "must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  Id. at 211 (quoting Iqbal, 129 S. Ct. at 1950).  "[A] complaint must do more than allege the plaintiff's entitlement to relief."  Id.; see also Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) ("The Supreme Court's Twombly formulation of the pleading standard can be summed up thus: 'stating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest' the required element.  This 'does not impose a probability requirement at the pleading stage,' but instead 'simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of' the necessary element." (quoting Twombly, 550 U.S. at 556)).  The defendant bears the burden of showing that no claim has been presented.  Hedges v. U.S., 404 F.3d 744, 750 (3d Cir. 2005).

**B.    42 U.S.C. § 1983**

Defendants advance several arguments against Plaintiffs' Section 1983 claims.  Defendants deny that they ever breached the AG's Directive at issue.  Defendants assert that, in accordance with the plain language of the AG's Directive, they exercised their discretion in choosing not to offer stationhouse

adjustments for alcohol-related offenses.  Alternatively, they
submit that the AG's Directive is ambiguous and that their
interpretation and application of it was reasonable.  In
addition, Defendants assert that Section 1983 does not provide a
proper vehicle to redress violations of state law because a
violation of state law does not equate to a violation of the
Federal Constitution nor does it cause a deprivation of a federal
constitutional right.  Lastly, Defendants contend that Plaintiffs
fail to state a claim upon which relief may be granted.

In response, Plaintiffs argue that the AG's Directive
carries the force of law and is designed to curtail any arbitrary
official discretion with respect to the implementation and
availability of stationhouse adjustments.  By categorically
rejecting any stationhouse adjustments for minor alcohol-related
offenses, Plaintiffs conclude, Defendants have patently
disregarded the AG's Directive, thereby infringing upon
Plaintiffs' constitutional rights to due process, equal
protection, and freedom from unreasonable seizures.  Plaintiffs
rebuke the assertion that Defendants exercised appropriate
discretion in rejecting the stationhouse adjustments because,
according to Plaintiffs, Defendants never considered the relevant
factors necessary to exercise such discretion, but rather enacted
a complete and unjustifiable ban against the adjustments for a
particular class of offenses.  Those shortcomings, say

10

Plaintiffs, engender federal and state constitutional claims.

Section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983.  To state a claim under Section 1983, a plaintiff must show that: (1) the conduct challenged was committed by a person acting under color of state law; and (2) that the conduct deprived him of his rights, privileges, or immunities secured by the Constitution or laws of the United States.  See Shuman ex rel. Shertzer v. Penn Manor School Dist., 422 F.3d 141, 146 (3d Cir. 2005).  When evaluating a Section 1983 claim, a court must first "'identify the exact contours of the underlying right said to have been violated'" and "determine 'whether the plaintiff has alleged a deprivation of a constitutional right at all.'"  Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 841 n.5 (1998)).

In this case, Plaintiffs allege in part that the Borough violated their constitutional rights.  A municipality, however, cannot be held liable under Section 1983 for the actions of its agents or employees under a theory of *respondeat superior*.

11

Groman v. City of Manalapan, 47 F.3d 628, 637 (3d Cir. 1995).
Rather, "[w]hen a suit against a municipality is based on § 1983,
the municipality can only be liable when the alleged
constitutional transgression implements or executes a policy,
regulation or decision officially adopted by the governing body
or informally adopted by custom."  Beck v. City of Pittsburgh, 89
F.3d 966, 971 (3d Cir. 1996) (citing Monell v. New York City
Dept. of Social Servs., 436 U.S. 658 (1978)).  Accordingly, under
Section 1983, a municipality may be liable for either its policy
or custom:

> A government policy or custom can be
> established in two ways.  Policy is made when
> a decisionmaker possessing final authority to
> establish a municipal policy with respect to
> the action issues an official proclamation,
> policy, or edict.  A course of conduct is
> considered to be a "custom" when, though not
> authorized by law, such practices of state
> officials are so permanently and well-settled
> as to virtually constitute law.

McTernan v. City of York, 564 F.3d 636, 658 (3d Cir. 2009)
(citations, quotation marks, and brackets omitted).  Here, the
Borough's alleged transgression is the issuance of an official
policy, specifically its Policy Memorandum barring any
stationhouse adjustment for a juvenile who has committed an
alcohol-related offense.

Further, Plaintiffs allege that Edward Borden, by
formulating and issuing the Borough's anti-diversionary policy
has violated Plaintiffs' constitutional rights.  "A defendant in

12

a civil rights action must have personal involvement in the alleged wrongs; liability cannot be predicated solely on the operation of *respondeat superior*." Rode v. Dellarciprete, 845 F.2d 1195, 1207 (3d Cir. 1988). "Personal involvement can be shown through allegations of personal direction or of actual knowledge and acquiescence." Id. "Allegations of participation or actual knowledge and acquiescence, however, must be made with appropriate particularity." Id.

At the outset, the Court agrees with Plaintiffs that the AG's Directive carries the force of law. The Attorney General of New Jersey (or, "AG") is the highest law enforcement officer in the State, see N.J.S.A. 52:17B-2, -98, and, as such, "is charged with adopting guidelines, directives and policies that bind local police departments in the day-to-day administration of the law enforcement process." O'Shea v. Twp. of West Milford, 982 A.2d 459, 465 (N.J. App. Div. 2009). "Those guidelines, directives or policies cannot be ignored[]: they are binding and enforceable on local law enforcement agencies, and, at a minimum, they are statements concerning the internal management or discipline of an agency." Id. at 466 (citations, internal quotation marks, and other brackets omitted); see also N.J.S.A. 52:17B-112(b) ("It shall be the duty of the police officers of the several counties and municipalities of this State and all other law enforcement officers to cooperate with and aid the Attorney General and the

13

several county prosecutors in the performance of their respective duties."). Consequently, the AG's Directive concerning the use of stationhouse adjustments compels local police departments to conform to its standards.[6]

That said, in order to establish any Section 1983 claim, Defendants must have violated the AG's Directive. The crux of Defendants' argument is that they comported with the clear and unequivocal mandate of the AG's Directive and exercised their discretion in choosing to exclude alcohol-related offenses from the diversionary program. Plaintiffs do not believe the AG's Directive affords law enforcement officials such broad discretion; rather, the Directive, Plaintiffs surmise, is designed to curtail the use of discretion in exchange for a more uniform, equitable policy that remains the same irrespective of geography, locality, or the arbitrary whims of different municipalities.

Given the legal and factual circumstances surrounding the interpretation, construction, and application of the AG's Directive in its various iterations, along with attendant policy decrees and statements, the present motion to dismiss does not provide the optimal occasion for the Court to rule on the

---

[6] In a memorandum generated by the Camden County Prosecutor's Office for the Camden County Chiefs of Police, Prosecutor Warren W. Faulk emphasizes that local police departments "must comply with and adhere to" the AG's Directive concerning stationhouse adjustments. (Pl. Opp., Wolf Decl., Exh. B).

substantive question of whether Defendants violated the AG's
Directive.  Instead, as it is required to do, the Court will
accept Plaintiffs' factual assertions as true and ensure that
their particular claims proceed absent a sufficient showing by
Defendants that the claims are meritless.  In any subsequent
motions presented to it, the Court may address the issue of
Defendants' alleged breach of the AG's Directive.  At that time,
the parties may discuss whether that matter requires a factual
determination by the fact-finder, as suggested by Plaintiffs, or
is simply a matter of law that the Court can resolve on its own
accord.  Further, discovery may enable the parties to uncover any
other documentation, testimony, or information that may assist
the Court in deciphering the proper scope and import of the AG's
Directive.  The Court believes it is best to address those issues
with greater guidance from the parties and after some discovery
has been permitted.[7]  To resolve those issues now risks

---

[7] Defendants also contend that Edward Borden is shielded from
Plaintiffs' Section 1983 claims pursuant to the doctrine of
qualified immunity.  The Court recognizes that a party's immunity
from suit should be adjudicated as early in the proceedings as
possible.  Nevertheless, that decision cannot be made with the
requisite degree of certainty it warrants at this time.  The
Court finds, as explained *infra*, that Plaintiffs have stated
colorable claims that should not be dismissed at the outset of
this case.  In addition, the Court believes that the nature of
the right to a stationhouse adjustment, and whether such a right
actually exists as set forth by Plaintiffs, should be determined
with the knowledge and consideration that subsequent briefing and
discovery may provide.  Accordingly, the Court cannot say at this
juncture whether Borden's actions violated a constitutional right
and whether that right was clearly established at the time of his

misconstruing the AG's Directive or casting an inappropriate judicial gloss over an executive policy.

Therefore, to the extent Defendants ask the Court to interpret, construe, or apply the AG's Directive, the Court denies their motion without prejudice.  However, assuming Defendants' misconduct as alleged by Plaintiffs, the Court will address the more timely question of whether Plaintiffs sufficiently state a claim upon which relief may be granted.  The Court will consider each of Plaintiffs' claims independently.

### 1.   Equal Protection

According to Defendants, Plaintiffs' equal protection claims fail because the Borough, as a single municipality empowered to regulate crime within its jurisdiction, cannot be liable for whatever disparate treatment may arise from the discrepancy between its laws and those of other contiguous municipalities. Alternatively, even if Plaintiffs' "classification" for purposes of their equal protection claims was valid, Defendants believe their policy to withhold any stationhouse adjustments for

---

alleged violation.  Should Defendants insist that qualified immunity bars any action against Borden in light of this Opinion, they are welcome to file another motion for the Court's consideration.

Likewise, the Court agrees with Plaintiffs that it is premature to determine whether any relief "akin to expungement" is procedurally flawed and thus unavailable in these proceedings, as asserted by Defendants.  That matter, as currently presented, is nebulous and should be revisited at a later time once the exact contours and viability of Plaintiffs' claims are crystallized and resolved.

alcohol-related offenses committed by juveniles is reasonably related to the legitimate interest in discouraging underage drinking.

Plaintiffs propose "class of one" equal protection claims, asserting that Defendants' refusal to provide stationhouse adjustments treated them differently from other juveniles in the State of New Jersey solely on the basis of their presence within a particular municipality.  Also, Plaintiffs submit that they are subject to differential treatment in comparison to other juveniles in the Borough merely because Plaintiffs' alleged acts of delinquency involved alcohol.  Lastly, Plaintiffs doubt the rationality of Defendants' policy precluding the diversionary program for alcohol-related offenses, but believe any rational basis to serve a legitimate purpose must be determined by a jury or drawn out during discovery.

"[T]o state a claim for 'class of one' equal protection, a plaintiff must at a minimum allege that he was intentionally treated differently from others similarly situated by the defendant and that there was no rational basis for such treatment."  Phillips v. County of Allegheny, 515 F.3d 224, 243 (3d Cir. 2008).  At this stage of litigation, Plaintiffs have satisfied the minimal federal pleading standards.  Conversely, Defendants have not carried their burden by demonstrating the insufficiency of Plaintiffs' claims.

17

Plaintiffs allege that the AG's Directive creates an enforceable, uniform policy binding all law enforcement officials throughout the State of New Jersey.  Further, they accuse Defendants of breaching that policy, thereby disparately treating those juveniles who commit alcohol-related offenses in the Borough from similarly situated juveniles who in other municipalities benefit from the AG's Directive and its diversionary policy.  On its face, Plaintiffs' equal protection claims allege the intentional disparate treatment of juveniles in the Borough based on the Borough's purportedly impermissible interpretation, construction, and application of the AG's Directive, a statewide directive carrying the force of law. Accordingly, Plaintiffs set forth a plausible cause of action under federal and state constitutions.  The ultimate viability of Plaintiffs' claims remain to be decided, but at this stage of litigation, they may proceed.[8]

Therefore, for the reasons stated above, Defendants' motions are denied with respect to Plaintiffs' equal protection claims.[9]

---

[8] To the extent Defendants suggest that a rational basis justifies the distinctions they have created concerning alcohol-related offenses, the sufficiency of that justification cannot be determined at this juncture.  Adjudication on that issue requires discovery and further argument and is reserved for another occasion.

[9] Plaintiffs also profess in their opposition brief that Defendants unfairly differentiate between juveniles who commit alcohol-related offenses and juveniles who commit other minor offenses.  However, given that Plaintiffs set forth that

18

### 2.   Due Process

Defendants attack the viability of Plaintiffs' due process claims.  Defendants point out that no fundamental constitutional right is at issue in this case.  Further, a procedural due process claim must fail, Defendants opine, because Plaintiffs do not allege any deficiencies with the formal process through which the juveniles in this case were punished.  That the juveniles were not offered a stationhouse adjustment, Defendants conclude, is not tantamount to a deprivation of notice and an opportunity to be heard.[10]  Moreover, Defendants do not believe that consideration for a stationhouse adjustment gives rise to a legitimate claim of entitlement as contemplated by due process, especially given the discretion entrusted to Defendants' decision whether to offer such an adjustment.

Plaintiffs counter that they have been deprived of a state-created right without due process of law.  In particular, Plaintiffs posit that the AG's Directive requires Defendants to consider those juveniles who have committed minor alcohol-related offenses for stationhouse adjustments.  Because the plaintiff-minors were not properly considered for stationhouse adjustments

---

allegation in their brief and not in their amended complaint, it is not properly before the Court.

[10] Defendants also argue that Plaintiffs cannot sustain a cause of action for substantive due process.  Plaintiffs acknowledge that they are not propounding any substantive due process claims.

in accordance with procedures enumerated in the AG's Directive,
Plaintiffs conclude, Defendants infringed upon procedural due
process rights.

"To prevail on a claim under § 1983 for deprivation of
procedural due process rights, a plaintiff must allege that (1)
he was deprived of an individual interest that is encompassed
within the Fourteenth Amendment's protection of 'life, liberty,
or property,' and (2) the procedures available to him did not
provide due process of law." Chambers v. Sch. Dist. of Phila.
Bd. of Educ., 587 F.3d 176, 195 (3d Cir. 2009) (citation and
internal quotation marks omitted).  Thus, when evaluating a claim
for procedural due process, the court "first must determine
whether the asserted interest is encompassed within the
Fourteenth Amendment's protection of life, liberty, or property;
if so, [the court] then ask[s] whether the procedures available
provided the plaintiff with adequate due process." Solomon v.
Phila. Hous. Auth., 143 F. App'x 447, 452 (3d Cir. 2005).
Generally, a liberty interest is conferred by a federal
constitutional or statutory provision or is created by state law.
See Shoats v. Horn, 213 F.3d 140, 143 (3d Cir. 2000) ("Protected
liberty . . . interests generally arise either from the Due
Process Clause or from state-created statutory entitlement.").

As part of their procedural due process claims, Plaintiffs
seem to assert that they were entitled to consideration of a

stationhouse adjustment and did not receive the process guaranteed by the AG's Directive.  In fact, in their amended complaint, Plaintiffs aver that each plaintiff-minor "was denied her right *to be considered* for a stationhouse adjustment."  (Pl. Amend. Compl. at 3 (emphasis added)).

Insofar as Plaintiffs contest Defendants' failure to abide by the particular procedures set forth in the AG's Directive, they have not articulated an actionable cause of action.  A plaintiff is entitled to due process of law before he or she is deprived of a substantive interest, either enshrined in the Constitution or borne by state law.  But the Constitution does not assure a plaintiff that he or she will receive the process conceived by a state law or regulation.  See Olim v. Wakinekona, 461 U.S. 238, 250 (1983) ("A liberty interest is of course a substantive interest of an individual; it cannot be the right to demand needless formality.  Process is not an end in itself.  Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement." (citation, internal quotation marks, and footnote omitted)).  To this point, the Tenth Circuit Court of Appeals has expounded:

> The mere expectation of receiving a state
> afforded process does not itself create an
> independent liberty interest protected by the
> Due Process Clause.  "If [it did], there would
> be a constitutional procedural due process
> right to have states adhere to any procedural
> rules promulgated by them."  Brandon v.
> District of Columbia Bd. of Parole, 823 F.2d

> 644, 649 (D.C. Cir. 1987).  This would have
> the ironic result of subjecting states who
> promulgate careful procedures to the scrutiny
> of federal courts, while states choosing not
> to adopt such provisions "entirely avoid the
> strictures of Due Process." Hewitt v. Helms,
> 459 U.S. 460, 471 (1983).  Accordingly, our
> task is not to ask whether the proceeding
> complied with the state's own guidelines.  It
> is only to ask whether the procedures actually
> followed comply with the federal constitution.

Jones v. Cowley, 1991 U.S. App. LEXIS 28725, at **11-12 (10th

Cir. Nov. 26, 1991) (other citations omitted); see also Olim, 461

U.S. at 250 n.12 ("[A]n expectation of receiving process is not,

without more, a liberty interest protected by the Due Process

Clause.").

The aforementioned notwithstanding, Plaintiffs intimate that

they have a legitimate claim of entitlement to a stationhouse

adjustment that warrants due process protection.  The AG's

Directive provides a diversionary program in the form of

stationhouse adjustments to juveniles for certain minor offenses,

which evidently would encompass minor alcohol-related offenses.

Further, the Directive, it seems, aspires to curtail the

arbitrary discretion that law enforcement may exercise in

providing the diversionary option.  See Stephany v. Wagner, 835

F.2d 497, 500 (3d Cir. 1987) ("[T]he dispositive question in

determining whether a state rule creates a protected liberty

interest is whether it 'plac[es] substantive limitations on

official discretion." (quoting Olim, 461 U.S. at 249)).

22

Considering the applicable standard of review, Defendants have not adequately demonstrated that no procedural due process claim has been set forth.  At this preliminary stage of litigation, the Court cannot conclude that Plaintiffs have failed to articulate a claim upon which relief may be granted.  Whether Plaintiffs' procedural due process claims ultimately are viable or prove meritorious likely will depend on, among other things, the proper reading of the AG's Directive or whether Defendants appropriately exercised whatever discretion they were assigned.  But, as noted *supra*, the interpretation, construction, and application of the AG's Directive shall not be determined in this Opinion.  Defendants otherwise have not carried their burden to show the utter implausibility of Plaintiffs' claims.

In the end, the discretion granted by the AG's Directive or the indefiniteness of its provisions -- or, perhaps, another consideration altogether -- may undermine and doom Plaintiffs' due process claims.  But, for the time being, Plaintiffs have satisfied the federal pleading standards.  Any consideration of the merits of Plaintiffs' case must be decided in a subsequent motion or during trial.

At this stage, Plaintiffs set forth plausible due process claims under federal and state constitutions.  Therefore, Defendants' motions are denied, without prejudice, regarding Plaintiffs' due process claims.

### 3.    Unreasonable Seizure

Defendants contest Plaintiffs' claims of unreasonable seizure on the grounds that even if accepted as binding upon their actions, the AG's Directive places no restrictions on the Borough's ability to arrest juvenile offenders, so long as probable cause justified the seizure.  On the contrary, Plaintiffs submit that the diversionary program enacted by the AG's Directive expressly intends for law enforcement to forego the seizure of juveniles who have committed minor offenses.  According to Plaintiffs, Defendants' disregard of the AG's Directive led to the unreasonable seizures of minors who otherwise would have been entitled to stationhouse adjustments.

Given Plaintiffs' allegations and arguments, the Court construes Plaintiffs' Fourth Amendment claims as averring a cause of action for false arrest and imprisonment.  To state a false arrest or false imprisonment claim under the Fourth Amendment and pursuant to Section 1983 requires that the plaintiff show that "the arresting officer lacked probable cause to make the arrest." Garcia v. County of Bucks, 155 F. Supp. 2d 259, 265 (E.D. Pa. 2001).  "Probable cause exists when the totality of facts and circumstances are sufficient to warrant an ordinary prudent officer to believe that the party charged has committed an offense." Id. (citing Sharrar v. Felsing, 128 F.3d 810, 817-18 (3d Cir. 1997)); see also Johnson v. Knorr, 477 F.3d 75, 84-85

(3d Cir. 2007) ("[I]n analyzing false arrest claims, a court to insulate a defendant from liability need only find that probable cause . . . existed as to any offense that could be charged under the circumstances." (citation, internal quotation marks, and brackets omitted)).

For certain minor offenses, the AG's Directive requires that stationhouse adjustments be made available to juvenile offenders. The availability of stationhouse adjustments, the AG's Directive provides, includes those occasions in which the seizure of a juvenile may be unwarranted.  In particular, Directive 1990-1, the precursor to Directives 2005-4 and 2008-2, reads, in relevant part: "It shall therefore be the policy of this State to encourage the use of 'curbside warnings' or 'stationhouse adjustments' as an appropriate law enforcement response to non-serious juvenile activity that does not warrant either the taking of a juvenile into custody or the filing of a complaint alleging delinquency."  (Pl. Opp., Wolf Decl., Exh. A, § 8a).  Based on this policy, Plaintiffs believe the seizure of a juvenile for a non-serious juvenile activity violates the AG's Directive and, in turn, the Federal Constitution.  Plaintiff's conclusion assumes too much.

First, nowhere in the AG's Directive does it categorically forbid law enforcement officials from arresting or seizing a juvenile who has committed a criminal or quasi-criminal offense.

In fact, Directive 1990-1 contemplated the arrest of juveniles for alcohol-related offenses, impliedly at least, with its decree: "Each county prosecutor shall take steps to ensure that juveniles taken into custody for or charged with an offense involving substance abuse, including alcohol abuse, are referred as soon as possible to available substance abuse evaluation and treatment, as appropriate." (Id. § 14a).  Moreover, a violation of state law does not necessarily give rise to a federal constitutional tort.  See Virginia v. Moore, 553 U.S. 164, 176 (2008) ("[W]hile States are free to regulate . . . arrests however they desire, state restrictions do not alter the Fourth Amendment's protections.").  So long as police officers comport with the requirements of the Fourth Amendment when executing arrests or seizures, specifically the existence of probable cause to justify their actions, those officers cannot be found to have violated the Fourth Amendment.  That police officers may fail to comply with policies or guidelines imposed by the state or their departments, in and of itself, does not create a Section 1983 claim.  See McMullen v. Maple Shade Twp., 2009 U.S. Dist. LEXIS 100191, at **11-12 (D.N.J. Oct. 28, 2009) (explaining that a seizure in violation of state law, alone, does not violate the Fourth Amendment).

For those reasons, Plaintiffs' Fourth Amendment claims are

dismissed.[11]

## IV.  CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss are granted in part and denied in part.  An Order consistent with this Opinion will be entered.


Dated: March 31, 2011                     /s/ NOEL L. HILLMAN
At Camden, New Jersey            NOEL L. HILLMAN, U.S.D.J.

---

[11] Defendants also contend that the Borough cannot be held liable for punitive damages under Section 1983.  See Mt. Holly Citizens in Action, Inc. v. Twp. of Mt. Holly, 2009 U.S. Dist. LEXIS 100032, at *36 (D.N.J. Oct. 23, 2009) ("It is well-established that municipalities . . . are immune from punitive damages under § 1983." (citing City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981))).  Plaintiffs do not contest this assertion.  Therefore, any claim for punitive damages against the Borough under Section 1983 is dismissed.